Case No. 18-1239 National Treasury Employees Union U v. FLRA Good morning. May it please the Court, Alison Giles for the National Treasury Employees Union. I'd like to reserve five minutes for rebuttal. Federal agencies have a general duty to bargain. Management rights are a narrow exception to that duty. The FLRA wrongly held here that an NTU proposal that the agency keep its prior ratings system in place, one that would limit agency ratings to no higher than successful, fell within the management rights to direct employees and assign work. The NTU's proposal does not. NTU's proposal does not affect what work gets done or by whom or when, which is how this Court has defined this particular management right. NTU's proposal only pertains to rating already completed work that's already been assigned to employees that have already been directed. FLRA's decision is wrong because it overreaches the definition of management rights. It is also inconsistent with the Congressional intent behind the Federal Labor-Management Relations Statute because Congress meant for management rights to be a narrow exception to the general duty to bargain imposed on the agencies. And the FLRA's decision is inconsistent with this Court's reasoning in the 1986 case of NTU v. FLRA. This Court held in that case that a proposal that pertains to superior work, like incentive pay or higher rating, does not implicate the management right to direct employees or assign work. The reason this Court found there's a difference between proposals that bear on superior work versus proposals that affect substandard work is the statute itself. The Court recognized that the management rights statute references disciplined employees, removing employees, so Congress meant for those to be included in management rights. But there's no comparable language in statute for superior work. The Court therefore held there's a big difference between the stick and the carrot. The stick, sanctioning inferior performance, is quite different from the carrot, rewarding superior performance, which is not a management right. And the Court emphasized that management rights are supposed to be a, quote, precise, defined activity. The FLRA's reading here was overly broad. Now the government will argue that the FLRA has already ruled on the negotiability of multiple rating-level proposals, but those cases are distinguishable in a very key respect. In a few of these, the union didn't actually even tee up the management rights issue. But they all involve the union attempting to restrict ratings for inferior performance. And under this Court's reasoning in 1986, that's a key difference. Of course, this Court... In Section 4302, it provides that there shall be, shall be, for each agency, performance appraisal systems that include result, produce results that can be used for rewarding and promoting employees, not just training, reassigning, firing, discharging, any of those things, but for rewarding and promoting. Shouldn't that inform what's included within management rights under 7305? So I think the Court, in the 1986 case, did focus on Section 7106 rather than 4302. But again, we're not going to affect the agency's ability to have some rating system in place. The issue is... No, I'm talking about, so I'm trying to, the intersection, sorry, 7106, the intersection between that and then the statute, the performance appraisal statute that says 4302. So I'm trying to figure out the intersection between 7106, management rights, and 4302, which specifically envisions performance appraisal systems that include results that will inform rewarding and promoting employees. I think the issue today is what is a management right, and that's defined in 7106. You're correct that there are statutes and, of course, plenty of regulations on many, many things. No, but I guess you seem to, your argument seems to assume that performance appraisal systems that provide results that allow for training, reassigning, reducing and grade, retaining and removing employees, that is below successful, are within management rights. Correct? Correct. Okay, and the two other things on that exact same statutory list, the exact same one, rewarding and promoting, that I left out just now, they're on the exact same list. And so I don't understand how they wouldn't also be part of the management rights. And so you're reading 7106 or 4302? I'm reading 4302, and you just agreed that to the extent performance standards are used, the results of those are used for everything else in 4302A3, that is training, reassigning, reducing and grade, retaining or removing employees, that that's part of management rights, that there's an intersection between these things. I think the issue for the Court is 7106, though. What is that? Right, I'm trying to figure out how this informs, how this provision, and your argument, which that provide information necessary for everything else on that list, are within management rights. That's what I was trying to understand. I thought you were agreeing that information that allows them to train, reassign, reduce and pay, make retention decisions or remove employees, that's within management rights. And I'm trying to figure out why the other two things on the same list, rewarding and promoting, performance standards that produce that information wouldn't just as much be on in the management rights list. Because I think it's a different statute. We're looking at 7106. What did Congress mean for management rights? And again, the wisdom of our proposal is not at issue here. We just want the right to come to the table. We're supposed to be able to talk to the agency about it. Well, 7106 wasn't enacted in a vacuum, right? This is all part of the government organization statute, and this recognition that when we're defining management rights, part of what the agency shall do is have these appraisal systems, and these appraisal systems shall provide information for promoting, demoting, for assigning, reassigning, for rewarding, for sending for more training, or discharging. And agencies are free to, for example, give incentive pay as a method of rewarding, but this Court found that's not enough to bring it within the ambit of what a management right is. Agencies can do it, but if we take it off the table, we are going to be left with very little that we can bargain over, because everything has some bearing on getting the agency's work done. But management rights under 7106 is supposed to be a precise, defined activity, and I submit that the FLRA has been overreaching that. You seem to argue in your opening statements that the 1986 case held in support of your position. That's not the way I read the decision, but they reserved it. Yeah, I would say it's reasoning supports our analysis. It certainly wasn't incentive. There's a big difference. I mean, and the problem, you're in an interesting bind, as you understand. 1986 is at best there to be looked at. It's not a holding in your favor, and there's a long line of agency authority, which you understand, is against your position. In an agency review, what is the Court of Appeals supposed to do in that situation, where the agency has a long line of authority against you? It stands. It's certainly not unreasonable. You can make the argument both ways as to which way you should look at this, on the performance standard side, on the incentive pay side. But the agency's position plausibly suggests that it should be on the performance standard side, and they have a lot of authority supporting it, unchallenged for years and years and years. And the one case you want us to reach back to and build up on does not say what you want it to say. The Court scrupulously says we're not reaching that question, which again suggests to me that they, too, understand you can go exactly the way the agency has been going. Two points. On the incentive pay proposal, I would remind the Court that when this Court in 1986 reversed the FLRA, that lower FLRA decision in analyzing the incentive pay proposal specifically looked to cases involving multiple rating-level proposals and said, these are substantially simpler. No, no, there's no question that the agency tried to make the connection. The Court said, no, not with respect to incentive pay, but we're not going to decide the question you are now bringing to the Court. Yes, the Court undercut part of the agency's argument. But they did not say that the agency's argument was wrong with respect to what we're talking about now. That is certainly true. I just wanted to emphasize that I think the 1986 case does bear strongly on this case. Of course, it does not dictate the result. But the FLRA decisions on this field, first of all, they mostly just rudely repeat what they initially ruled in the AFSCME case. And I think it is important to think they didn't address the specific proposal we have here today. The agency itself, in its intervener brief, acknowledges that the authorities' cases are a little different than what we have here today. They say in their intervener brief on page 14, quote, the authorities' decisions do not specifically address a proposal that retains a pass-fail system but allows an agency to create multiple levels of failure. That's what we have today. So I would submit that the proposal at issue today is different from the previous FLRA decisions in this area. If your position is that you would like us to essentially overrule or turn back years of FLRA decisions, what's your best argument under the statutory scheme? Are you suggesting that it's inconsistent with the statutes, it might be somewhat inconsistent with our 1986 decision? I mean, what's your argument for overruling those years of precedence? I would say you don't have to overrule FLRA. Of course you can, but I would say that you can distinguish those cases. And the two arguments are the language of the statute. There are a lot of verbs in the management rights statute, and evaluating the ratings are not there. So whether they squeeze under the assigning work or directing employees, it would come back to common sense. Assigning work is what work to be assigned to which employees and when. And our proposal doesn't address that. What about the related statutory provisions that Judge Moret cites? You know, looking at a range of different statutory provisions together, doesn't that still support FLRA's position? Well, the agencies are allowed under many statutes and regulations a whole broad swath of activities in terms of incentive pay, RIFs. It covers lots of things. But whether they are allowed to take it off the bargaining table entirely, I think we need to focus on 7106, the management rights statute. Even if they have, as the FLRA found here, the authority to establish higher level of ratings, would you not still retain your ability under the 1986 case to negotiate about how those ratings, when someone gets that ratings, how that informs whether they get incentive pay, bonuses, those types of things? You would still retain that ability to negotiate. But the consequences other than work assignment, what the reward for those ratings are, wouldn't you? I'm sorry. If the proposal stays in place and it's more or less a pass-fail, would we still be able to bargain? No, no. I guess what I'm saying is if they were able to have a system that had super successful or outstanding or whatever the thing is over successful. And then successful and then the tiers that you acknowledge underneath that. But it included something higher than just successful. And they said they're using that to help decide who gets what work. But you would still have the ability to negotiate incentive pay, whether that's someone or bonuses for that higher rating that someone accomplished, would you not? I assume you would insist you still have that. Just because you could bargain over a few other ways of rewarding superior performance, I don't think means that we should be allowed to not bargain, remove from the bargaining table for this kind of proposal. I understand that argument. I just wanted to make sure that I wasn't missing that there was some overlap or consequence that would then deprive you of the ability to negotiate bonuses and incentive pays for higher ratings. I think that's right. And can I ask you, my understanding is that I saw somewhere in the briefs that negotiations are concluded. Do they end up adopting a system that has something higher than successful? The pre-existing pass-fail system is staying in place while this appeal plays out. But I don't think that's in the record and the agency can confirm that. But at the time being, the pass-fail system is still in place. And then if the FLRA were to be sustained, would something hop into place or would you just go back to the bargaining table? I'm trying to figure out what the status here is. If the FLRA is reversed, which is what we would ask, then we would go back to the bargaining table of our proposal. If it's affirmed, then the agency would be free to put their new system into place. And that includes something higher than just successful. What does it have in addition, higher than successful? What it would prefer to do. I don't know if it's a four or five level system, but I think it's a multiple tier rating system. Something higher than successful. Yes. Just one other question. You suggested focusing on 7106. I'm wondering, what do you make of 7106 A to C, the provision about with respect to fill-in positions, management has the right to make selections for appointments from among properly ranked and certified candidates. How does that relate to this type of ranking system, right, where management may want to distinguish how successful a person has been in order to fill positions in the future? Those management rights aren't an issue in this case. They weren't raised below, if you look at Joint Appendix 72 and 73. Only two were raised in brief below, and only those two were addressed by the authority. But at the end of the day, if they can, in the 1986 decision, drop that footnote that suggested there were other provisions that would allow having a higher, a system that would have the type of more positive ratings. There are a lot of cases in all those management rights, and we haven't briefed them, and I can't say I'm prepared to address all the cases in all the other management rights, but I think under 5 U.S.C. 71-23, we are limited today to the two that were presented below. If no more questions for the moment, I'll reserve some more time. Thank you. Good morning. May it please the Court, Noah Peters for the FLRA. For nearly 40 years, the authority has consistently interpreted the Federal Service Labor Management Relations Statute as permitting agencies to establish, to rate employees on not just a pass-fail system, but to rate employees as excellent or outstanding. For example, as far back as 1983, the authority stated, an agency is not limited to merely prescribing the minimum level of performance which will be required from an employee for job retention. Rather, the results of employee performance appraisals are to be used for multiple purposes, i.e., as the basis for rewarding and promoting employees, reducing them in grade and retaining or removing them. In this regard, Congress explicitly stated its intention that appraisals of performance, for all purposes, be made within a single interrelated system, and that is a reference to 5 U.S.C. 4302, which states that agencies shall use the results of performance appraisals as a basis for training, rewarding, reassigning, promoting, reducing in grade, retaining, and removing employees. The authority has very reasonably defined the statutory language direct as meaning to supervise and guide employees in their work, and it's reasonably interpreted in that language as allowing agencies to rate employees not just as on the minimum level needed for job performance to hold their jobs, but also as outstanding employees and as employees that have demonstrated great abilities in the past. Can you help me out if you can? At first blush for me, there's a clear distinction between an employer having the right and in the FLRA context, the right with no negotiation obligations, to set job standards, performance standards. This is what this job is, this is what we require, and everything that goes with that. Very different from that is the employer having set all the standards, however the employer wants to, assessing how well the employee did pursuant to those standards. I can't find, you'll have to tell me if I'm wrong, I can't find a single case in which the authority has clearly said that within the embrace of direct and assigned, we also include assessing how well you did pursuant to the established standards. Where has the authority ever said that? They always seem to be referring to direct and assigned, which I understand is not a big deal. Right, in the AFSCME 1984 decision, I think the language that the authority used, and this is the language that the authority quoted in its decision below, the number of performance levels for both individual job elements and overall performance are essential aspects of the right to assigned work and direct employees. The determination of the number of performance levels directly affects the degree of precision with which management can establish and communicate job requirements, performance standards, the range of judgments which management can make regarding performance in the context of performance appraisals, and the range of rewards and sanctions which management can apply to such performance. I still don't get it. I really don't. I read that language, I understand what you're saying, but it seems to me there's a striking difference between, here are the standards, I expect you employees to follow these standards. I set them the way we want, and you have to follow. Then a different question at another day is, how well did you do? And I don't know how assigned and direct has anything to do with my assessment of how well you did. Well, I think that the— You certainly got no court decision. We declined to reach it in 1986, as you know, I think in part because it's not self-evident, and I think if it was self-evident, I don't mean to say we would have reached out, but certainly we wouldn't have put the footnote in as a starter, and we might have even gone further and said, you know, this includes— I don't see any case where you hit it dead on. Well, I think that the—again, I think that the definition that the authority had of direct in the 1982 NTEU case where it was noted that the authority had defined direct to mean supervising guide employees in their work. And I think guiding employees in their work does embrace the right to say, you know, you've done a certain level of performance, you've done perhaps the minimum disciplinary consequences, but we would prefer that you do it in this way or this is what—you know, you could have done better in this area, in this area, in this area. And I think it also goes to the right to assign work, too, because— Sorry, what you just explained sounded like someone who's not doing 100 percent. They need to do better in this area or that area. And the issue here is people who are doing 100 percent. And the question is whether in assigning their work it matters, or directing their work, that they were doing 125 percent versus 135, or however you want to quantify these ratings. Right. I don't know that that's—you know, I don't know that it's that binary. And I think that the 1986 decision, there was a section of it where the union had argued that, well, the right to assign employees and—assign work and direct employees was not— it did not include incentive pay because excellent work is not assigned or directed by the agency. It said, you know, the idea was that you're assigning or directing the 100 percent, but you're not assigning or directing 120 percent. And the court actually rejected that argument. And it said the union acknowledges, although no employee can be compelled to push more data keys per month than the number immediately below the incentive pay level, if an employee should happen to reach that number within three weeks, he would not be entitled to take the rest of the month off. He would be required to continue working as assigned work would continue to be the entry of data. So it held that 125 percent work or work above the successful level is still within the directing and assigning. But then the next paragraph is where they said, so because of that, we must confront head-on the authority's contention that the management right to assign includes the management right to reward superior performance of what has been assigned. Right. If anybody lost on the rationale in 1986, you did. Well, you didn't lose it. They're trying to buy it. Right. I think that the the issue in the 1986 case was not the carrots versus sticks where sticks are within the management. Right. The carrots are not. I think the the issue in the 1986 case, the issue that we lost on was that you can bring in incentive pay into the management. Right. Because it has the same purpose as assigning and directing. And it's as well, you know, incentive pay would tend to encourage employees to do their work. So it's within the management. Right. Yeah. That's where the the opinion said that's not a legitimate way to interpret the statute. You can't just say everything that's useful to motivating employees. That seems to be your argument here. Well, it's it's different because I think in as five U.S.C. clear performance levels above a successful level are not primarily are not brought within the management. Right. Just because they're motivating employees. So, for example, five CFR three fifty one point five or four states that a level of outstanding is to be accounted as 20 years of service for purposes of a risk. So they're so outstanding levels are used for purposes of reductions. Sure. That's not your argument in this case. It can't be. You didn't raise that argument. Well, the agency did in its brief. And I think the FLRA relied only on assign and direct. Right. But I think that that informs the fact that out that I think that's a different management. Right. You're referencing. Correct. Yeah. But I think it shows that it's the same. It informs the interpretation of assigning direct. I think it goes along with five U.S.C. forty three or two. It shows that the this is not a case where the authority tried to bring in the fours and five rating levels because, well, that's that's another way to motivate employees. So it's within the management. Right. I think what the authority did in this case was it says this is a core part of the management. Right. Because it affects the range of judgment. No, they said it's a core part of the management right to assign and direct work. Right. Not to address layoffs. Right. Yeah. OK. So I'm just right. I don't want you represent the FLRA. They did not rely on any other management. Right. Even though the nineteen eighty six case. Right. Said here's some other things it might be under. Right. So you agree you can't rely on. That's right. We agree that I think that assign. We think that a sign in director are more than sufficient to say that the number of levels of performance ratings are within the management. Right. You can say it's rewarding employees within the management. Right. Well, I think that it's within the direct. I'm sorry. Only within a sign and directing the only one for us is the sign and direct is rewarding employees within assigning and direct. Well, obviously, the import of the 1986 decision is not everything that you do to reward employees within the management. Right. But communicating to an employee what outstanding work is, what communicating the number of performance tiers that they'll be rated on, I think, is within the management. Right. Because it gives us the authority to tell us to the better part of just communicating information to them. I'm just trying to get rewarding. It's part of the sign directing. I don't. Well, again, it's not everything that you would do. It's the need to do to reward an employee here. I didn't say I'm just. Would you say that the proposal here is about rewarding workers? I mean, is that how you would characterize. No, no. And I think 43. How would you characterize what CBP is hoping to do? I think it's restricting the range of the restricting the ways that the agency can guide and direct employees in their work and saying, you can rate them as being on a pass fail system. You can create degrees of failure, but you can't rate them. You can't use a performance management system to say this is an outstanding employee or this employee has done outstanding work in the past. All you can do is create a gradation that says this is this is the past level. And this is failure one. This is failure. What is the what is the connection between ratings that are above successful and assigning and directing work? Well, I think you can you draw that more. Yes. So, for example, with assigning work, you would want to know if there's a particularly difficult or sensitive task. You would want to know the agency would want to know which employees have done an outstanding job in the past in order to do that. And again, that goes back to forty three or two, the performance management system, which says that agencies are entitled to use a single interrelated performance management system to identify which employees are outstanding, which employees might need more training. Is that the statutory provision the agency relied on, the FLRA relied on? I think that it's thirty three or two has has very much informed. Is that what the FLRA relied on in this case? Not not exclusively. No. Not at all. I thought it was a sign and direct. The only reason it's perplexing to me. The argument is a bit perplexing to me. A sign and direct is a sign and direct. That's what FLRA. I mean, I can understand if you reached out and made it a broader, richer argument, but you didn't. Right. I think the language that the authority quoted, which is really key to its reasoning from the AFSCME 1984 decision about the number of performance, the determination of the number of performance levels directly affects the degree of precision with which management can establish and communicate job requirements. The range of judgment management can make regarding performance in the context of performance appraisal and the rate of reward and sanctions which management can apply to such performance. That is the footnote there is a reference to, if not this statute, if not forty three or two, then parts of the federal personnel manual that were interpreting this performance management system. So I think that the if you look at the way the authorities precedent has developed in the NTU 1983 decision, which explicitly cited forty three or two to this language from AFSCME 1984, which calls harkens back clearly to to this statute, which is also part of the same. The Civil Service Reform Act of 1978. I think that forty three or two has profoundly influenced the way that the authorities use management rights. And I think that's apparent in its reasoning in this case. I mean, you know, there's there's an underlying assumption here that you're somehow giving away the shop. If unions can bargain over this, you're not giving away anything. All they have is the opportunity to discuss how you evaluate employees who are working pursuant to standards that you have a right to establish on your own. Well, we're not we understand you establish the standards. All we want to talk about is how you were set. Isn't that exactly what happens in the incentive? The incentives aren't automatic. Right. I'm talking about how the extra pay will come and you can make the argument of a sort that you are making here. Well, but you know how we set up that incentive system affects how we assign indirect employees. Same argument. And we said, no, we're not buying that. Right. Well, I think that if you were to rule and say it will against us, I think it would seriously curtail the ability for agencies to use the results. I mean, there would be ways to evaluate employees as, you know, informally, but they wouldn't be able to use the performance management system as a basis for training, rewarding, reassigning. Why? It's merely bargainable. That's all right. But you're not giving anything away. You have to lose it and bargain. It's merely bargainable whether or not it's a mandatory subject of bargain. It's not whether or not they have a right to anything in particular. They got to bargain about it. That's all right. But I think that it would cut back. It would be contrary to the spirit, to the language of 43 or two. If they were required to bargain, they would be able to communicate a successful rating, but they wouldn't be able to rate employees as outstanding or excellent. Why? You don't know, because that would be the object of bargaining. That's what you'd figure out in bargaining. Merely because this proposal is on the table does not mean it's a zero-sum game. It's this proposal or not. There are all possibilities in between. That's what negotiations are all about. Right. I think in there you go back to the language of the 1982 decisions, decisions which say that this is the management rights were defined by Congress for a reason, so they couldn't be chipped away at. No question. No question. And the unions on their side will tell you we have almost no rights to bargain about anything in this sector. So they fight over things like this because you're not talking about it very much. And so I'm trying to understand. It just seems like there's a distinction between your right to establish this is what the job is. And we can tell you that's it. And the question is whether or not an employee has done it. Right. And I do want to address briefly, and I know that I'm way out of time, of the idea that management rights are a narrow exception to the otherwise broad duty to bargain. That comes from the only case that cited in support of that is the 1989 Overseas Educational Association decision. And if you look, that part of the decision was joined only by Judge Robinson. It wasn't an opinion for the entire circuit. In fact, the other two judges said very clearly they did not agree with that part of the statute, that if management rights had been intended to be a narrow exception to the otherwise broad duty to bargain, then Congress could have written that into the statute. No, I don't think anyone's seriously doubting that the management rights section sweeps broadly. It does in the public sector and federal sector. It does. The question is how broadly. Right. And your reliance on 4302 is a little hard because it uses the word reward, and that's the word that was used in our 1986 decision to say rewarding is exactly what we have to negotiate over. Yeah, I would suggest a distinction, though, between saying, so this is using, this talks about using the results of performance appraisals as a basis for training, rewarding, reassigning. I think that more strongly indicates that agencies can establish 4s and 5s in the performance management system that it suggests that they have an unfettered right to provide incentive pay for employees, even if the incentive pay happens to be based on their performance appraisals. And again, in the proposal in the 1986 decision, I don't think it was clear. I'm just confused. What is this rewarding here? Is that rewarding a 4302? Right. A3. Right. That's right. Is that a management right or not? Again, it's not a specific management right. I think it just indicates that. So the fact that it's in 4302 doesn't make it a management right? No, but I think it's something that you interpret 4302 as consistent with the management rights to direct and assign employees. And I don't think that that necessarily means that, you know, that they have the basis to do anything that can be construed as training employees, that they can do anything to reward employees or reassign or promote employees, and that's all. Is it a reward to get, because of your outstanding evaluation, that you get the best projects to work on, the ones that will put you in line to get incentive pay and bonuses, the ones that will get the attention of management, the most important ones? Again, I think that when you're talking about the judgments that management can make and communicate to employees, that falls within the management right. That's what we're trying to debate here is whether you're over-successful. So what I'm trying to understand is just at a human level, is because I got outstanding or excellent, whichever is higher, I get all the PLUM assignments. And those PLUM becomes a cycle because I do the PLUM assignments and the most important ones, then I get more awards and then I get to do more of them. It sounds like a reward to me. Right. I think that this language has to be seen in the context of just performance appraisals and the range of judgments that management can make based on performance appraisals. I don't think that this language is written into the Management Rights Provision Award. It says, again, anything that we do, this creates a non-federal right to get incentive pay. I'm just trying to figure out how it's not saying you went above and beyond. Right. You get extra special work. I get it. It's distinct from giving you special assignments. So we're not talking about the layoff protection here. We don't have that in front of us. Special assignments is what I heard you say. That's part of the assigning work. You get the special stuff because presumably you're going to give the good stuff to your best employees, but that's not a system of rewards? No. Because those could be also the most – what I was thinking about when I was saying that was not giving employees who've done great work the PLUM-like, pushy assignments. I was saying if there's a particularly difficult task that requires a high degree of skill, then management might want to use the results of its performance management system to identify who the truly outstanding employees are who could be counted upon to do something extremely difficult or extremely sensitive. I wasn't saying – Yeah, but those, again, are going to be the ones who will then get the most attention from management and will be most likely to get the incentive. I was in the government a long time. Those are the ones who get the incentive pay and the bonus awards because they worked on the special, most important, hardest case. Right. But, again, the consequences that flow from management's recognition of somebody as being a five on the performance management system, I think that's something that can be bargainable. But management's right to make the determination this employee has done a five job, I think that's within the management rights to direct employees in assigned work. I think the authority's precedent has been very consistent on that for the better part of four years. With that, since I'm way over time, I will submit. Thank you. May it please the Court. Melissa Patterson from the Department of Homeland Security. I think it might be helpful to start with Judge Rouse's question of, is this proposal going to how the agency can reward employees? And we don't think it is at all. I think a long line of FLRA cases suggests that that is not what performance appraisal systems are about. We certainly know what they're only about. When an agency sets out these evaluation standards, what it's saying is not just on the back end how well you did. It's saying, here's how well you should do your job. Now, I think everybody's in agreement, and it follows directly from this Court's decisions in 1982, that the agency is free to communicate sort of, with a lot of specificity, here's how not to do your job. Here are various buckets of unacceptable ways to do your job. And so the only question is, does the agency have the same freedom to communicate to employees all of the good ways to do your job? And I think that's what the FLRA has long recognized with its decision here, and stretching back to 1983, that what you're talking about is the degree of precision that the agency can use in communicating to employees how to carry out their duties. Now, I think there was some suggestion in a reply brief that the only thing before the Court was that, sort of that flattened number of rating levels available to the agency. And that is not correct, because at base, what they want is a content station. However many levels they are, they don't want any of the levels to be able to distinguish between merely passing. Well, merely passing. That's successful. That's exactly what the job is. Your argument makes perfect sense until I read our 1986 decision, which seems, which declares simply wrong this view that going up is the same as evaluating failures or levels of failure, and says that the right to reward for superior performance is surely a good deal less implicit in the right to assign work than is the right to sanction for inferior performance. So it's, you know, this sanction-reward thing is very much in there. It seems to be very much, here's the job, and you certainly have the right to police people who aren't doing the job at whatever level of degree. When we circle, yes, you are doing the job, 100 percent doing the job, but we'd like to find out if you're doing 125 or 150. That's really, we'd like to figure out how much icing is on the cake here. And if we were, and I think what this court addressed there was sort of the consequences outside the management rights statutes that you can attach to that icing, right? But the court was very careful in footnote 4 to reserve the question of whether communicating the standards at all was a form of directing the employees in the first place. Now, if we were talking about, you know, we want to motivate employees, so we're going to stick gold stars in the door of everybody who gets an outstanding for the next month, that might not be a management right under 7106 under this court's reasoning because it's a reward outside the enumerated management rights. But this is an exercise of the enumerated management rights itself because it is a form of directing employees. Yeah, you're saying directing and grading are inextricably tied together. I think setting out the standards for grading and directing are inextricably tied together. Wait, now, wait, you're cutting back on what I'm saying? Not any grading? I'm adding a nuance, Your Honor. If what we're talking about is the application of the standard that's been previously announced to an employee. The grading. The application. The grading, how well you met. The grading and not the rubric is the distinction I'm trying to draw. Just setting out the rubric, saying this is what it means to be an outstanding employee versus a good employee versus a merely acceptable employee, the promulgation of the rubric that you're going to use in the grading is what we're talking about here, and that is a form of directing employees. And moreover, it's intimately bound up in the assignment of work, which is the second management right that the authority has long relied on. I think it's a very common sense of human-level intuition that when you are trying to decide which employees should do which task, it's helpful to know whether someone is merely acceptable at something versus good or excellent at something. Is that in the authority's rationale? Well, the authority certainly has relied for over three years. In this case, is that in the rationale? They don't spell it out in that. It seems it's terribly important because you're talking about something that at least facially looks quite different. I'm setting standards, and I'm grading on whether you met the standards. And if what you're saying is so self-evident, it's kind of amazing. And given 1984 and how we rejected the authority's rationale there, it's kind of amazing here that the authority didn't play it out the way you and counsel on your side are arguing the case. They're not playing it out the way you're playing it out. I think if you look back to starting in 1983. No, no, how about this case? Well, Your Honor, in— Is the rationale in this case? Yes, because— Where? What you just said. The authority sided back to its 1984 decision where it started expanding on its initial— initially it had applied it only to below acceptable. That was its first 1988 decision. Starting in 1983, again in 1984, and certainly since this Court's 1986 decision, the authority has looked to 4302, starting in its 1983 decision, and said, hey, this is a form of assigning work. This is a form of directing employees. So I think the allegation the union brings here that the reasoning here was too cursory gives— I don't think those cases go as far as you'd like. That's why I asked counsel on your side of the case to give me the best example of a case in which you think the authority has said, these are inextricably the same. They're tied together. Assigning and measuring how well you did on the assignment are the same. I don't see any case that says that. I think— That's a very easy statement to make. It's never been made. Certainly in terms of directing employees, the authority said here, and it has said many times, that what we're talking about is the degree of precision the agency is able to use. Recall, what the union is saying here— Let me be fair, as clear as I can in asking this question. What is the best case that you have in which you think the authority has said, our authority to set the standards of what a job should be done also includes unilateral right to assess the performance pursuant to those standards? Where did they say that? I think the best cases are the 1983 decision at 13 FLRA 325— And I don't see it in there. And the 1984 decision, where, I mean, again— Counsel, in your side, is it the same language you read? Because that's not—the language is trying to get there, flirts around it, but it doesn't really say it the way you want. Well, Your Honor, recall that, of course, the agency's decision is entitled to deference here. So in order to prevail, what the union would have to show is that the conclusion of the FLRA was an unreasonable reading of this statute. No, all they have to show is just a question that's never been answered. I'm not sure that's right. The authority has answered this question repeatedly. Well, that's what's going around in circles. I keep saying where. Where do you think they've made that direct connection between we have your right to set the standards, and that includes a unilateral right to grade you on your performance of those standards? Again, returning to our earlier colloquy, I do think there's a difference between the rubric and the actual grading. And I think that the authority has properly focused on the promulgation of the rubric in the first place. We're not talking here about grievances, which you can file if you don't like how these are applied to you. What we're talking about is— We're talking about the right to negotiate. That's all we're talking about. Right. Whether the union has the right to negotiate how an employee will be evaluated in the performance of a job pursuant to agency standards. That's all we're talking about. Correct. And we are trying to decide whether or not the agency's ability to distinguish between okay performance and good performance is a form of directing employees, because we're trying to figure out the scope of 7106. And a final point on that, which is that in the 1982 decision of this court, the court looked at the legislative history of 4302, and it said—the Senate report there says at the end of the day, it's going to be management who gets to establish the performance appraisal system. And so, just as in the 1982 NTU decision, we think that statement strongly suggests that the FLRA has gotten it right in allowing agencies to do just that. If there are no further questions, we ask the court to affirm. Thank you. Does counsel have any time? We'll give you two minutes. Thank you, Your Honor. Just briefly, I appreciate that the FLRA has picked up on Your Honor's question, but they did not make the argument in their briefs that 4302 undercuts changes, somehow alters the 7106 analysis. I would remind the court that the pass-fail system has been in place at the agency for many years, so the suggestion that somehow it's unworkable is not that plausible, but the merits are not before this court. We do just want to come to the bargaining table, and we will certainly listen to the policy arguments as to whether it's a good idea or not. And lastly, Your Honor, Judge Edwards mentioned job standards cases. There are a number of cases about what does it take to get the job done. Is it nine batches an hour, ten reports a month, 100 inspections per year? What's critical, what's not critical? This proposal does not touch those. Again, it just goes to the rating of work that's already been done, already assessed, employees who have already been directed. If there are no further questions. Do you agree with counsel's last statement that the 82, if I remember correctly, 82-84 cases essentially make the judgment that I'm inquiring about, that is, setting standards includes or assigning, assigning includes setting the standards and evaluating how well you've done in performance of those set standards? I think she was referring to the companion 1982 cases, an NTU and an AFGU one. The NTU case involved nine batches per hour to avoid remedial action. The AFGU case involved how do you define critical elements. I don't think they dictate a result here. The court in 1986 referenced those cases and said they only have to do with action, the minimal amount of work done to avoid remedial action. So they're distinguishable from here. Neither one involved multiple rating levels as we have here today. They say they mark out beforehand the amount of quality and timeliness of the work employees are to perform. And requiring the agency to bargain over those would mean it's having to bargain over quantity, quality, and timeliness, which it must establish in making work assignments and directing employees. Why isn't that equally true, whether it's degrees of failing or degrees of succeeding? I think that goes to we need the job to involve nine batches an hour. The agency gets to say it's nine batches. It has to be done per hour, what the error rate is. That's what timeliness and quality involve. Quality can only be, there can be no higher quality? There can only be baseline quality and lower quality? This is not how agencies work. They don't say we'd like nine batches an hour. Feel free to do eight. We'll give you a lower rating. Feel free to do ten. We'll give you a higher rating. They say to get the job done, we need nine batches an hour. And then after that, to be sure, some employees are going to do a little bit above what's required, a little bit below. And that will affect after the fact. But it doesn't go into what is the job involved. And those cases are off the table because those are management rights. And we have an emergency now. I know the job says nine. We have an emergency now. We really need to get ten out an hour for the next week because of this pressing agency emergency. I would like to assign the people to that task who have been doing ten rather than nine. Or at least at times we've done ten rather than nine. Is that assigning work, directing and assigning work? Assigning work cannot be read so broadly to involve some unknown amount of work by some unknown employee at some future time. That is so broad that it will swallow the room. I don't understand. So what I just said does not count as assigning work? Or it's illegitimate? Or I don't understand why. We have an emergency now. Sorry, that is the ordinary job description, nine units an hour. We're having an emergency situation. We're recovering from a government shutdown or whatever. We have an emergency situation. It's the consumer. This is the Border Protection people. We have an emergency. We need people who can do ten an hour to get this, to meet this emergency. And I know there's some employees who've done that. And I would like to assign the work to them. It sounds to me like assigning work. And it sounds to me like knowing that someone did better would help in doing that. I would direct the Court back to the reasoning of the 1986 case that said not everything that bears in some degree on getting the job done can be assigning work or directing employees. They were talking about incentive. They weren't talking about whether you get an A-plus on your paper, which is what the agency is talking about here. They're saying whether they were talking about, well, because you got an A-plus, you get to be line leader. Right? You get to negotiate about whether they get to be line leader because they got A-plus. This is about whether they can put an A-plus on their paper. And then when push comes to shove and we're in a crisis situation, I'd like to bring out the A-plus team. Well, to use your example, they might want to bring out the people who got incentive pays last year because maybe I want to give them the ten batches. But, again, that can't be enough because that would be such a broad reading of management rights that there would be very little left. But if I'm hearing you correctly, I'm trying to listen very carefully, you're kind of agreeing with the authority that those cases, those earlier cases, can easily be read to embrace the grading of an employee's work pursuant to the established standards? I'm sorry. The FLRA's cases do involve multiple ratings levels. But I think they are limited to where union attempts to restrict remedial ratings. And we're saying ours is distinguishable because we are not trying to interfere with the agency's right to address substandard performance. But in the proceedings below, didn't the union argue that the FLRA should overrule its earlier precedents? I think that was specifically stated as requesting the authority to overrule their earlier cases. We did. And, of course, if this Court does not agree with me that the cases are distinguishable, it can overrule it. But I think they're distinguishable in a very important respect for the reasoning set forth in the 1986 case, the difference between awarding superior work, sanctioning inferior work. If you have the system that you envision that has successful and then gradations of less successful, is it within the agency's management right to assign work and say, we're going to give the work first to people that got successful? They're going to get the daytime shifts, people who got successful. People who didn't get successful may have to work the 3-11 shift or something like that. Can they do that? Is that assigning work? That's assigning work, right? I'm not sure about the whole shift thing, what other limitations there may be on that. Can they factor in an assigning work in any way whatsoever, the fact that someone was successful rather than less successful? They might consider it the same way they might consider, gee, I wonder who got accommodation last week or incentive pay. You seem to agree that assigning and directing work includes the ability to use gradations of successful and below, and now I'm trying to say give me an example of how they could assign work based on whether you got successful or marginally less than successful. Would you agree they can do that and that's part of their power to direct and assign work? I mean, I don't know that as supervisors. It might get into their head whether there's an actual limit to a contract. Would you agree that they can have gradations below successful, then? Because I think we want to steer away from the FLRA cases that have been directly on point. We're recognizing the limitations of the case law in front of us. Aren't you directing an employee if you grade performance? You're now grading performance and you've graded poorly. Aren't you saying this isn't acceptable? Here's what we expect you to do. Here's the standard we established. You didn't meet it. Isn't that directing the employee? I think directing goes to the front end. I'm directing you to do nine batches an hour. What we're talking about is an evaluation after the fact. Yeah, an after-the-fact evaluation. Someone's in a job and you give them an evaluation. And your evaluation is, forget the particulars of your request here. It's an evaluation. It's not the highest. It's not the lowest. But it suggests some deficiency. So the grade is not great. It's a C-plus grade, in effect. Aren't you directing the employee by saying, this is not up to snuff? It's C-plus. We want you to do better than that. And if you've got any questions, ask them. I don't think this court, or the FLRA, has interpreted directing employees that broadly. It should be more what goes into getting the job done, those contentless job standard cases we discussed. Suppose a supervisor sees someone at work and goes up to them and says, right, do it like this. That's directing, right? Yes. The supervisor puts the same thing in an evaluation pursuant to the agency's authority to evaluate work done pursuant to standards. It's the same thing. I don't think it's the same thing. The first example is at the front end. Going in, I need you to get this done. I said nine batches an hour. Everyone's got to get it up to nine. Okay. Got you. Thank you very much. Thank you. The case is submitted.
judges: Millett, Rao, Edwards